William A. REMO, Jr., Executor of Estates of Stephen F. Remo and Kathleen Remo, Deceased, and Administrator of the Estate of Alicia Marie Remo, Deceased

v.

UNITED STATES of America FEDERAL AVIATION ADMINISTRATION.

Anjam Hanid BHATTI, Executrix of the Estate of Abdul Aziz Khan, Deceased

v.

UNITED STATES of America FEDERAL AVIATION ADMINISTRATION.

Bettyjune MILLER, Administratrix of the Estate of Peter C. Miller, Deceased

v.

UNITED STATES of America FEDERAL AVIATION ADMINISTRATION.

Civ. A. Nos. 92–4133, 92–4891 and 93–1489.

United States District Court, E.D. Pennsylvania.

May 16, 1994.

Robert M. Knauer, Allentown, PA, Daniel Patrick Leonard, Boston, MA, and F. Lee Bailey, West Palm Beach, FL, for plaintiff Remo.

Robert B. White, Jr., Philadelphia, PA and Evans W. North, Washington, DC, for plaintiff Bhatti.

Martina Walsh McLaughlin, and Clifford E. Haines, Philadelphia, PA, for plaintiff Miller.

Patrick E. Bradley, U.S. Atty., Washington, DC, for Government.

## DECISION AND ORDER

VAN ANTWERPEN, District Judge.

This tragic case involves the midair collision of two small-engine aircraft near the Queen City Airport in Lehigh County, Pennsylvania on July 30, 1989 in which seven persons perished. Plaintiffs[1] assert that the United States of America, specifically a Federal Aviation Administration (FAA) Air Traffic Controller in the radar control room at the Allentown–Bethlehem–Easton Airport who was controlling one of the two aircraft, failed to notify the pilot of that plane of the proximity of the second plane. Plaintiffs allege that the air traffic controller's failure to employ the appropriate degree of care and vigilance in the provision of air control services led to a "missed" air traffic call and, ultimately, to the fatal collision. Plaintiffs have brought this negligence action pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2674. From February 7 through February 15, 1994, the court sat

---

1. Plaintiffs include William A. Remo, Anjam Hanid Bhatti, and BettyJune Miller. The claims of plaintiff Carlene Malik were settled with the defendant United States of America prior to the trial in this matter. Since we are hearing this case non-jury, the settlement was referred to Chief Judge Cahn of this court for approval. This settlement agreement was approved by Chief Judge Cahn on March 8, 1994.

In addition, plaintiff William Remo entered into a partial settlement agreement with the defendant United States of America with respect to claims arising from the death of Alicia Remo and Kathleen Remo. To the court's knowledge, nothing has yet been filed with the court with respect to this partial settlement.

non-jury[2] and heard seven days of testimony in this matter.[3] In addition, with the express consent of counsel on the record, on February 16, 1994 the court and counsel made an off the record, on-site view of the Radar facilities at ABE Airport, the control tower at ABE Airport, and the airstrip and other facilities at the Queen City Airport. Following the trial, the parties were given ample time to file proposed findings and fact and conclusions of law, along with reply memoranda. Based on the testimony presented and these extensive briefs, we now render our decision.

## I. FINDINGS OF FACT

1. At 1:34:28 p.m. on Sunday, July 30, 1989, a midair collision occurred between a Beech A–36 Bonanza ("Bonanza") carrying six persons, and a Cessna 182 ("Cessna"), carrying one person. As a result of the collision, both aircraft plummeted to the ground killing all seven persons aboard. The pilot and sole occupant of the Cessna was Peter C. Miller who held a valid FAA pilot's license.

2. The Cessna was operating as a jump aircraft for skydivers performing at the Lehigh Valley Balloon Festival, a weekend long event that began on July 28, 1989. The Cessna was equipped with a Mode C transponder, a device which, when interrogated by Air Traffic Control radar, provides information regarding the position and altitude of the aircraft. (T.T. 2/8/94, p. 52). An aircraft emitting a transponder signal is referred to as a secondary target by air traffic controllers.

3. Queen City Airport is an uncontrolled airport located approximately five nautical miles southwest of Allentown–Bethlehem–Easton International Airport ("ABE Airport"), a controlled airport. The elevation of Queen City Airport is 399 feet above mean sea level (MSL).

4. At the time of the collision, the Cessna was descending in a right hand turn for the purpose of landing on runway 25 at Queen City Airport. There are two runways at Queen City Airport: runway 7/25 and runway 14/32.[4] The collision occurred southwest of Queen City Airport approximately 1.1 nm from the intersection of the two runways and 6.4 nm from ABE Airport. (T.T. 2/15/94, p. 7).

5. At the time of the collision, the Bonanza was on an insurance check-out flight (T.T. 2/7/94, p. 72).

6. Stephen F. Remo, a commercial airline pilot and certified flight instructor was seated in the right front seat of the Bonanza at the time of the collision. (T. 2/7/94, p. 63). Also aboard the Bonanza were two of the airplane's three owners, Dr. Abdul Kahn and Dr. Mohammed Malik, as well as Remo's wife and daughter, Kathleen Remo and Alicia Marie Remo, and the son of Dr. Malik, Raymond A. Malik.

7. The Bonanza was equipped with flight controls accessible to a pilot seated in the right or left front seat of the aircraft. (T.T. 2/7/94, p. 174) It is contested whether Dr. Malik or Dr. Kahn was seated in the left front seat of the A–36 at the time of the collision.[5]

8. When aircraft maneuver at an airport for the purpose of taking off and landing, they maneuver in a traffic pattern. For Runway 25 at Queen City Airport on July 30, 1989, a left hand pattern was used.

9. Queen City Airport is an uncontrolled airport insofar as there is no control tower and insofar as pilots landing and departing from the airport do not expect sequencing

---

**2.** Actions against the United States under section 1346 of the Federal Tort Claims Act are tried by the court without a jury. 28 U.S.C. § 2402.

**3.** The court wishes to express its appreciation for the cooperation of all parties despite the hardships of unprecedented cold and snowy weather during the seven days of trial.

**4.** Runways are numbered according to their compass headings.

**5.** We believe that sufficient evidence was presented which would enable us to make the determination of the identity of the person occupying the left front seat of the Bonanza. However, such a determination is not necessary for our evaluation of the government's alleged negligence in this case. We decline to make this factual determination in view of other civil litigation pending in this matter in state court.

into and out of the airport. (T. 2/9/94, pp. 153–154). ABE Airport, however, had an active FAA control tower. Located in the same building as the control tower is an Air Traffic Control facility known as a TRACON (Terminal Radar Approach Control). On July 30, 1989, the ABE Airport TRACON did not have the capability of recording and storing its radar data.

10. None of the radar data recorded at Philadelphia Approach, New York Center, or Naval Air Station Willow Grove contains any targets corresponding to the Bonanza prior to or at the time of the accident. Because of the post-crash condition of the Bonanza's transponder, it was not possible to determine whether the transponder had been activated based on an inspection of the device.

11. The radar in use at the ABE Airport TRACON was capable of depicting aircraft with operating mode C transponder at 1,400 feet MSL and above within a six mile radius of ABE Airport. (T. 2/15/94, p. 183).

12. After a period of study, in 1985 the FAA adopted the airport radar service area (ARSA) concept and began establishing AR-SAs at airports throughout the United States known as primary airports. In 1987, an ARSA was established at ABE Airport (Exhibit P–15). ARSAs are part of the FAA Air Traffic Control (ATC) System. The ABE Airport ARSA consists of two concentric circles centered on the ABE Airport. The inner circle has a five nautical mile radius from the center point while the outer circle has a 10 nautical mile radius from that point. Within the inner circle, all airspace is within the ARSA from the surface of the ground to an altitude of 4,400 MSL with the exception of airspace within a one nautical mile arc centered on Queen City Airport which is excluded from the ARSA from the ground surface to an altitude of 2,200 feet MSL. The airspace between the inner and outer circles (including the airspace within the one nautical mile arc centered on Queen City Airport) is within the ARSA extending from an altitude of 2,200 to 4,400 feet MSL south and southwest of Queen City Airport and extending from an altitude of 1,900 to 4,400 feet MSL west and southwest of Queen City Airport. (Exhibit P–15).

## Witness Observations

### Raymond Frank

13. Raymond Franke is a commercial airline pilot and a Certified Flight Instructor. Franke was flying sightseeing trips on the day in question and was located at the departure end of Runway 25 preparing to take off at the time of the collision.

14. As he was maneuvering his Cessna from the taxiway onto Runway 25, Franke heard on the Common Traffic Advisory Frequency (CTAF) frequency: "Jump plane entering downwind, Queen City." (T. 2/8/94, p. 136).

15. Franke testified that he had been taxiing from Queen City Aviation to Runway 25 for approximately three minutes when he observed the collision of the Bonanza and the Cessna.

### John Daniel:

16. John Daniel is the only witness presently known to have seen the Bonanza on the ground prior to the accident flight. On the day of the accident, Mr. Daniel, a pilot, observed a Beech Bonanza on the apron in front of the apron of the upper hangar at Queen City Aviation. (T. 2/10/94, p. 226). At the time of his observations, Mr. Daniel was seated on a bench in front of the Queen City Aviation office building. (T. 2/10/94, p. 225). Mr. Daniel's location was less than 100 feet from the aircraft. (T. 2/10/94, p. 228). Based upon Mr. Daniel's familiarity with the Beech Bonanza type aircraft (T. 2/10/94, pp. 223–224), and his precise description of the number and appearance of the persons that got into the airplane (T. 2/10/94, pp. 226–227), it is clear that the airplane he observed was, in fact, the Bonanza involved in the accident.

17. After seeing the six persons board the Bonanza, Mr. Daniel observed the aircraft start and taxi toward Runway 25. (T. 2/10/94, pp. 229–230). Although Daniel briefly lost sight of the aircraft during taxi (T. 2/10/94, p. 230), Mr. Daniel specifically recalled the takeoff and departure of the Bonanza from Queen City. (T. 2/10/94, pp. 230–231). After the aircraft's departure, Daniel lost visual contact with the Bonanza until, looking to the southwest, he saw debris, in-

cluding the wing of an aircraft, falling from the sky. (T. 2/10/94, pp. 231–232). After reporting the collision to personnel at Queen City Aviation, Daniel drove to Knopf Pontiac where he saw an aircraft wreckage that he believed was the Bonanza. (T. 2/10/94, pp. 232–233). Daniel estimated that the entire sequence of events, from the time he saw the aircraft begin its taxi to the runway until the time he observed the debris falling from the sky, occurred within a 10-minute time frame. (T. 2/10/94, p. 234).

*Judith Kroeger:*

18. Judith Kroeger was the only eyewitness known to have observed the path of the Bonanza immediately before the collision. Mrs. Kroeger lives at 3515 Fox Run Drive in a residential development located approximately 1.5 miles southwest of Queen City Airport. (Exhibit D–32). Mrs. Kroeger's home is located approximately on the extended centerline of Queen City Runway 25. (Exhibit D–32). Although Mrs. Kroeger is not a pilot, her husband is a pilot, and he owns and flies an A–36 Bonanza similar to that flown by Dr. Khan. (T. 2/14/94, p. 13).

19. During the early hours of the afternoon, on July 30, 1989, Mrs. Kroeger was working in the yard of her home. (T. 2/14/94, p. 14). Mrs. Kroeger's attention was drawn to the sky when she heard the distinctive sound of an A–36 Bonanza that had just climbed over a stand of trees located along the Little Lehigh River between the Kroeger home and Queen City Airport. (T. 2/14/94, pp. 15–17). According to Mrs. Kroeger, the Bonanza was on climbout, having just taken off from Queen City Airport (T. 2/14/94, p. 15), and was positioned in a climbing attitude. (T. 2/14/94, p. 17). Although Mrs. Kroeger was not able to estimate the altitude at which she first saw the Bonanza, she stated that the aircraft appeared to be below the usual pattern altitude. (T. 2/14/94, p. 19). She added that, as the aircraft left her line of sight, it did not appear to be climbing as though it were going to proceed to a higher altitude and go someplace. (T. 2/14/94, p. 20).

20. The aircraft, while in Mrs. Kroeger's sight, travelled in a slight-banking left turn proceeding from her left to her right in a curved path, ultimately travelling away from her. (T. 2/14/94, pp. 18, 39, 45). As the aircraft curved in front of her, Mrs. Kroeger was able to see a full profile of the airplane. (T. 2/14/94, p. 48).

21. As the Bonanza proceeded on its flight path, Mrs. Kroeger lost sight of the airplane behind another line of trees. (T. 2/14/94, p. 20). Two seconds later, Mrs. Kroeger heard a loud sound—a pop—and then the absence of sound. (T. 2/14/94, p. 21). Upon hearing the noise followed by the silence, Mrs. Kroeger ran into her house and informed her husband of her assumption that the "Bonanza" had an engine failure. (T. 2/14/94, p. 21). Mrs. Kroeger and her husband then ran outside the house and saw smoke rising from the direction of Devonshire Hills, the direction in which the airplane was headed. (T. 2/14/94, p. 21). Upon observing the smoke, Mrs. Kroeger called the Lehigh Valley Emergency Dispatcher and informed them that a "Bonanza" had an engine failure and crashed. (T. 2/14/94, p. 21).

22. After calling the Lehigh Valley Emergency Dispatcher, Mrs. Kroeger, her husband, and her daughter drove to the crash location and upon arriving learned that another aircraft had also been involved and that a midair collision had occurred. (T. 2/14/94, p. 22).

23. Based upon the uncontroverted testimony of Mrs. Kroeger and Mr. Daniel, it is apparent that both individuals viewed the accident Bonanza at different phases of its final accident flight. Mr. Daniel's testimony indicates that the Bonanza in fact departed from Queen City Airport shortly before the collision. Mrs. Kroeger's testimony indicates that the Bonanza did not leave the traffic pattern and return to it immediately prior to the collision. If this had been the case, substantially more than a few seconds would have elapsed between the time that Mrs. Kroeger lost sight of the Bonanza and the time that she heard the "pop" and saw the resulting columns of smoke.

*Mathias Brickler:*

24. Mathias Brickler was the FAA air traffic controller at the Allentown Approach

arrival radar position at the time of the collision. At the time of the collision, Brickler had six years experience at the ABE Airport TRACON as a full performance level controller. (T. 2/11/94, p. 122).

25. Brickler had handled the Cessna jump plane on several occasions during the days preceding the collision, and the aircraft had arranged to use the same discrete radar identification code for each of its flights. (T. 2/11/94, pp. 125–126).

26. Brickler testified that, at the time the Cessna reported to him that it was one minute prior to jump, Brickler scanned his radar scope for any traffic that would have been a factor for the parachute jump operation. (T. 2/11/94, p. 129). Brickler testified that he saw no traffic that would have been a factor. (T. 2/11/94, p. 129).

27. Brickler testified that the next report that he heard from the Cessna was "jumpers away." Brickler testified that, at the time of the jump, he was blocking the airspace in which the jumpers were operating. He testified that if he had identified any traffic in the area, he would have kept the traffic clear of this blocked area. (T. 2/11/94, p. 130). Brickler testified that he would have protected the airspace for at least five or six minutes until the jumpers were safely on the ground. (T. 2/11/94, p. 131).

28. Brickler released the Cessna to switch to the Queen City CTAF frequency at approximately 33:16. He released the aircraft at that time for several reasons. First, Brickler testified, he had scanned his radar scope and saw that there was no traffic that would have posed a risk to the Cessna enroute to the airport. (T. 2/11/94, pp. 132–133). Second, Brickler saw that the Cessna was in close proximity to the Queen City airport. (T. 2/11/94, p. 132). Third, Brickler observed that the Cessna was descending to pattern altitude at a high rate. (T. 2/11/94, p. 132). Brickler believed that the frequency change was necessary at that time to give the pilot enough time to exchange traffic information on the CTAF frequency. (T. 2/11/94, p. 132). Mr. Brickler released the Cessna to the CTAF frequency approximately one minute and 12 seconds prior to the time when the Cessna entered the Queen City Airport traffic pattern. (T. 2/9/94, pp. 158–159).

*Flight Path Reconstruction*

29. Bernard Coogan prepared a reconstruction of the flight paths of the Bonanza and the Cessna up until the time of the collision. (Exhibit D–32). The flight path of the Cessna jump plane was based upon recorded radar data stored and obtained from New York Control Center for the time period 32:10, when the Cessna was at an altitude of 4,400 feet MSL, until 34:10, the time of the last NTAP (National Track Analysis Program) radar hit corresponding to the Cessna. (T. 2/14/94, p. 69). The flight path of the Cessna also includes a primary return contained in the Philadelphia Approach CDR (Continuous Data Recording) data corresponding to the position of the Cessna at time 34:22. (T. 2/14/94, p. 85). Mr. Coogan also reconstructed the flight path of the Bonanza based upon information obtained during his interview with Mrs. Kroeger at the Kroeger residence (T. 2/14/94, p. 68), and based upon the known point of departure and known point of collision. (T. 2/14/94, pp. 68, 70). He also interviewed other witnesses, including Mr. Raymond Frank and Mr. John Daniel. (2/14/94, p. 62).

30. Mr. Coogan concluded that, immediately prior to the collision, the Bonanza had departed Queen City Airport Runway 25 and flew in a climbing, left-hand turn illustrated by the gold line on Exhibit D–32. (T. 2/14/94, pp. 70–71, 114). The Cessna flew a descending right-hand turn illustrated by the blue line in Exhibit D–32. (T. 2/14/94, p. 70).

31. Recorded radar information demonstrates that, at the time of the frequency change transmission by Mr. Brickler at time 33:16, the Cessna was descending through an altitude of 3,100 feet MSL. (T. 2/14/94, p. 79) (Exhibit D–32). At this time, working backward from the time and location of the collision, the Bonanza would have been on its initial climbout from Queen City Airport at an altitude of 180 feet above ground level. (T. 2/14/94, pp. 79, 82). At the time that the Cessna reached 2,200 feet MSL, the floor of the ABE Airport ARSA, the Bonanza would have been at approximately 400 feet above ground level. (T. 2/15/94, p. 134).

32. Approximately 30 seconds prior to the collision, the two aircraft were approximately 1.7 miles apart. This distance is within the 2 mile range in which a pilot is expected to be able to pick out an airplane that is within his environment. (T. 2/14/94, p. 123; T. 2/10/94, pp. 182–185). At this point, the pilots in each of the aircraft should have been able to see each other. (T. 2/14/94, pp. 124–125). The opportunity for pilots in the Bonanza to see the Cessna continued substantially unobstructed until the time of impact. (T. 2/14/94, p. 129; T. 2/10/94, pp. 183–184). From approximately 15 seconds prior to impact until the actual mid-air collision, however, the pilot of the Cessna would have had to bank the aircraft to see the Bonanza. (T. 2/14/94, p. 128). After analyzing the likely flight path of the Bonanza in conjunction with the airplane's performance characteristics, Mr. Coogan calculated that the collision occurred at approximately 1,200 feet MSL. (T. 2/14/94 p. 80).

33. At no time prior to the collision did the Bonanza or the Cessna take any known evasive action to avoid the collision. This indicates that the pilot of each airplane did not see the other airplane prior to the collision.

### Radar Coverage

34. Based upon the presence of secondary radar targets contained in the Philadelphia Approach CDR data, Philadelphia Approach radar coverage southwest of Queen City Airport in the vicinity of the accident site extended down to 1,200 feet MSL. (T. 2/14/94, p. 97; T. 2/15/94, pp. 162–163).

35. The ASR–7 radar in place at ABE Airport on July 30, 1989, had the capability of detecting secondary returns in the vicinity of Queen City Airport down to an altitude between 300 to 400 feet above ground level (700 to 800 feet MSL) when an aircraft was departing straight out on Queen City Runway 25. (T. 2/15/94, p. 168; T. 2/11/94, p. 135). Primary, or non-transponder returns on departure from Runway 25 at Queen City could be detected by ABE Airport radar down to approximately 700 feet above ground level (1,100 feet MSL). (T. 2/9/94, pp. 57–58; T. 2/15/94, p. 134).

36. All experts agreed, however, that a radar phenomenon known as "shielding" or "blanketing" can reduce the ability of radar to detect the reply of a transponder. (T. 2/9/94, pp. 58–59; T. 2/11/94, p. 103; T. 2/15/94, pp. 135–136). This phenomenon is well known to air traffic controllers. (T. 2/11/94, p. 103). Specifically, when an airplane is turned away from the antenna, as the Bonanza was during its departure turn from Runway 25, a secondary target may not be detected by ABE Airport Approach radar until it is as high as 700 feet above ground level (1,100 feet MSL). (T. 2/15/94, p. 169). For these reasons, Mr. Beaudoin opined that immediately prior to the collision, the departing Bonanza would not have appeared on Mr. Brickler's scope unless it had reached 1,100 feet MSL. (T. 2/15/94, p. 169).

### Pilot Duties

37. Good operating practice dictates that pilots operating into and out of uncontrolled airports announce their intentions and position over the CTAF frequency. (Exhibit D–12, ¶ 157). Specifically, pilots approaching an uncontrolled airport with the intention of landing, should make radio announcements when they are 10 miles out, and upon entering the downwind, base, and final legs for landing. (Exhibit D–12, ¶ 157, Table 4–1). It is also axiomatic that pilots approaching and departing an uncontrolled airport must listen to the radio so that they will hear the calls of other approaching and departing aircraft.

38. Aircraft departing an uncontrolled airport should make announcements on the CTAF frequency before taxiing to the runway, upon taxiing onto the runway for departure, and upon leaving the runway. (Exhibit D–12, ¶ 157, Table 4–1).

39. Peter C. Miller, the pilot of the Cessna, made no call over the CTAF frequency prior to actually entering the downwind leg of the traffic pattern at Queen City Airport. Miller should have, in the practice of due care, made more calls over the frequency prior to entering the pattern. (T. 2/14/94, p. 133).

40. If, as Plaintiffs contend, the Bonanza was entering downwind at pattern altitude from the southwest, the pilot of this aircraft

also failed to report his position on the CTAF frequency.

41. Pilots are required by FAR 91.67 (Exhibit D–2) and by common sense, to maintain such vigilance as is necessary to see and avoid other aircraft while flying in visual conditions. (T. 2/14/94, p. 143; T. 2/10/94, p. 189). Significantly, the duty to see and avoid is imposed not only upon the pilot-in-command of an aircraft, but also upon other persons in a position to look outside of the aircraft for potentially conflicting aircraft. (T. 2/14/94, p. 143; T. 2/10/94, p. 184).

42. Pilots' duty to maintain vigilance for other aircraft is highest when operating in and about the traffic pattern of an uncontrolled airport. (T. 2/10/94, p. 186) (Exhibit D–12, ¶ 157(a)(1)).

43. Visual Flight Rule Pilots are or should be aware that, even when in radar contact, limitations of radar (when available), traffic volume, controller workload, and unknown traffic may prevent a controller from providing timely traffic advisory information. (T. 2/14/94, p. 149) (Exhibit D–17). They also know, or should know, that traffic advisories are secondary to the controller's primary duties: the separation of Instrument Flight Rule aircraft under their control and the issuance of safety alerts. (T. 2/14/94, p. 149) (Exhibit D–17). Thus, pilots are taught never to rely exclusively on the provision of air traffic advisories as a means of maintaining separation with other aircraft. (T. 2/14/94, p. 151; T. 2/10/94, p. 191). Plaintiffs' own pilot expert, Jack Eggspuehler, testified that he would never assume that there was no other traffic in a traffic pattern. (T. 2/10/94, p. 188).

44. Reasonably prudent pilots are aware, or should be aware, that ARSA services to aircraft proceeding to a satellite airport such as Queen City will be terminated at a sufficient distance to allow time to change to the appropriate tower or CTAF frequency. (T. 2/10/94, p. 208; T. 2/14/94, pp. 163–164) (Exhibit D–19; Exhibit D–12, ¶ 101(i)). They also are aware, or should be aware, that ARSA services need only be provided within areas of radar coverage. (Exhibit D–19; Exhibit D–12, ¶ 101(c)).

45. When Brickler released Miller to switch to the CTAF frequency, Miller knew or should have known that he would no longer receive radar services. (T. 2/11/94, p. 69; T. 2/15/94, p. 141). Miller also knew or should have known, however, that if he wanted to remain on the controller's frequency, he could have made such a request to the controller and, if traffic permitted, in all likelihood such a request would have been honored. (T. 2/14/94, p. 165).

### Air Traffic Controller Duties

46. Robert Hale, Plaintiffs' expert air traffic controller, agreed at trial that air traffic controllers have *no* duty to warn pilots of traffic that does not appear on their scopes. (T. 2/11/94, p. 73).

47. Air traffic controllers have a duty to terminate ARSA services to aircraft landing at secondary airports at a sufficient distance from the airport to allow the pilot to change to the appropriate frequency for traffic and airport information. (Exhibit D–7, ¶ 7–107) (T. 2/9/94, pp. 157–158, 167).

48. As Mr. Boyer, Plaintiffs' Air Traffic Control expert agreed during cross examination, pilots entering the traffic pattern at an uncontrolled airport require sufficient time to announce their position, time to listen to other aircraft in the traffic pattern, and time to get the flow of the traffic in the pattern. (T. 2/9/94, pp. 159–160). He further agreed that an air traffic controller must give a pilot the opportunity to accomplish these tasks prior to entering the traffic pattern. (T. 2/9/94, pp. 159–160).

49. As set forth in the Air Traffic Control Manual ("ATCM") (Exhibit D–7), and as Mr. Hale agreed, there is no prohibition against releasing an airplane to switch to the CTAF frequency at a secondary airport when that airplane is still within the ARSA as long as there is no conflicting air traffic. (T. 2/11/94, p. 104) (Exhibit D–7, ¶ 7–107). Hale further agreed that an air traffic controller has the discretion to release an aircraft to the CTAF frequency one-and-one-half minutes prior to that aircraft entering the traffic pattern where that controller has determined that there is no conflicting traffic. (T. 2/11/94, p. 96).

50. An air traffic controller is not obliged to foresee or predict whether previously unidentified traffic may become a factor to an aircraft after radar services to that aircraft are terminated. (T. 2/15/94, pp. 139–140).

51. The radar services to be provided to an aircraft operated in an ARSA are set forth in the Air Traffic Control Manual ¶ 7–101. (Exhibit D–7). With respect to Visual Flight Rule aircraft operating in an ARSA, an air traffic controller is required to provide traffic advisories and safety alerts. (Exhibit D–7, ¶ 7–101(a)(4)) (T. 2/9/94, pp. 143–144; T. 2/15/94, p. 126). The air traffic controller is not required to provide separation to two Visual Flight Rule aircraft operating in the ARSA. (T. 2/9/94, pp. 145–146).

52. A traffic advisory is a notice given by an air traffic controller· to an aircraft to whom he is providing radar services regarding the presence of another airplane. (T. 2/15/94, pp. 126–127). Traffic advisories are provided when, in the air traffic controller's judgment the proximity of the aircraft warrants it. (Exhibit D–7, ¶ 2–21) (T. 2/9/94, p. 147; T. 2/15/94, pp. 129–131). A traffic advisory is issued when, in the judgment of the air traffic controller, two aircraft are in such proximity as to constitute a potential collision hazard. (T. 2/9/94, pp. 147–148; T. 2/15/94, p. 133).

53. All. three air traffic control experts acknowledged that, if Brickler had scanned his radar scope at the time of the frequency change and determined that there was no conflicting air traffic between the Cessna and the airport, his decision to terminate radar services and send the Cessna to the CTAF frequency would not have been a negligent one. (T. 2/15/94, p. 172; T. 2/10/94, p. 211; T. 2/9/94, pp. 184–185).

54. Nothing in the FAA Air Traffic Control Manual or in the 7220.2 order requires an air traffic controller to remain in contact with the pilot of a jump plane until all jumpers are on the ground. (T. 2/15/94, p. 143). Indeed, neither of these orders even refers to such a requirement. (T. 2/15/94, p. 143). According to Mr. Beaudoin, who has substantial experience handling jump aircraft, air traffic controllers do not require pilots of jump airplanes to notify them when jumpers are on the ground. (T. 2/15/94, pp. 143–145).

## II. DISCUSSION

Plaintiffs have brought this action pursuant to the Federal Torts Claims Act, 28 U.S.C. §§ 1346(b) and 2671, *et seq.* Under the Federal Tort Claims Act, the state law that would apply to determine the liability of a "private individual under like circumstances" applies to determine the liability of the government. 28 U.S.C. § 2674. Here, the applicable law is that 'of Pennsylvania, the place of the collision.

▪ Plaintiffs allege that FAA was negligent in its provision of air traffic control services. In order to prevail on a negligence claim under Pennsylvania law, the plaintiff must prove the following elements: (1) a duty, recognized by the law, of the defendant to conform to a certain standard of conduct; (2) a failure. to conform to the standard required; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the interests of another. *Morena v. South Hills Health System,* 501 Pa. 634, 462 A.2d 680, 684 n. 5 (1983); *Markovich v. Bell Helicopter Textron, Inc.,* 805 F.Supp. 1231, 1236 (E.D.Pa.1992), *aff'd* 977 F.2d 568 (3d Cir. 1992). In order to prevail, plaintiffs are obligated to prove each of these elements by the fair weight or preponderance of the evidence. *Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280, 1284 (1978).

▪ In Pennsylvania, the general rules of negligence apply to negligence actions involving airplane crashes. *Himmler v. United States,* 474 F.Supp. 914, 929 (E.D.Pa. 1979); *Griffith v. United Airlines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964). While FAA controllers are held to a standard of ordinary care with respect to their job responsibilities, pilots are also bound by a duty to operate aircraft with a high degree of care. The Third Circuit has explained the concurrent duties of pilots and air traffic controllers as follows:

Both the pilot and the air traffic controller owe a duty of care to passengers in an airplane. Negligence by the pilot does not,

in and of itself, absolve the government of liability. Each is responsible for the safe conduct of the aircraft and the safety of its passengers ... Thus, there may be concurrent liability.

The pilot is in command of the aircraft, is directly responsible for its operation, and has final authority as to its operation ... He must be aware of those facts which are material to its proper operation and is charged with that which he should have known in the exercise of the highest degree of care ...

Tower personnel and air traffic controllers are often a source of vital information. If there is negligence on the part of such persons, it must have a causal relationship to the happening of the accident—in other words, their conduct must be a proximate cause.

*Redhead v. United States,* 686 F.2d 178, 182 (3d Cir.1982), *cert. denied* 459 U.S. 1203, 103 S.Ct. 1190, 75 L.Ed.2d 435 (1983) (citations omitted). We have already detailed with greater specificity the applicable duties of both air traffic controllers and pilots in our findings of fact section, *supra.*

█ It is apparent, therefore, that plaintiffs have established the first and fourth elements of their negligence cause of action under *Morena, supra.* With respect to the first element, the FAA owes a duty of care when conducting air traffic control operations. As to the fourth element, plaintiffs have indeed suffered an enormous loss as a result of the mid-air collision.[6] Nonetheless, we believe that plaintiffs have failed to demonstrate by a preponderance of the evidence the second *Morena* element—the breach of a duty of care. For the reasons that follow, we find that Mr. Brickler acted in conformity with an air traffic controller's standard of care.

Plaintiffs assert two theories by which Mathias Brickler, the air traffic controller at the Allentown Approach arrival radar position at the time of the collision, breached his duty of due care. First, plaintiffs allege that the Bonanza was depicted on Mr. Brickler's radar scope at the time of the frequency change, and that Brickler failed to notify the Cessna of the presence of the Bonanza as air traffic. Plaintiffs' second theory of negligence is that Mr. Brickler terminated his radar services to the Cessna and told the plane to switch to the Queen City CTAF frequency too soon. We find that plaintiffs have not met their burden of proof in this regard and that neither of these two theories is supported by the evidence.

## A. The Bonanza Was Not Visible on the Radar Scope

Plaintiffs allege that the Bonanza was depicted on the ABE Airport Radar, and that the failure of the FAA radar controller, Mr. Brickler, to see the Bonanza was a result of his failure to pay the proper attention to his radar scope. The government responds by arguing that given the short duration of the Bonanza's flight prior to impact, the plane had not yet achieved a sufficient altitude to appear on ABE Airport radar.

Both the government and the plaintiffs' experts acknowledged that if the Bonanza was not depicted on Mr. Brickler's scope at the time that Brickler released the Cessna to change frequency, Brickler's actions cannot be considered negligent. (FOF # 53) Therefore, our inquiry must focus on whether the Bonanza would have appeared on Mr. Brickler's scope prior to the release of the Cessna.

In this regard we assign great weight to the expert testimony provided by Mr. Bernard Coogan. Based upon the information provided by Mr. Daniel, Mrs. Kroeger and other witnesses (detailed in our Findings of Fact, *supra* ), Mr. Coogan presented a convincing reconstruction the flight path of the Bonanza. In synthesizing complex and often contradictory testimony, Mr. Coogan surpassed plaintiffs' experts with his able pre-

---

**6.** In accordance with our order of January 27, 1994, the trial in this case was bifurcated on the questions of liability and damages. The court must first determine the question of liability. Given our determination as to liability, we will not require further testimony as to damages. In rendering our decision, we are nevertheless mindful of the terrible loss suffered by the plaintiffs as a consequence of the mid-air collision.

sentation of a consistent theory of the events of July 30, 1989.

Mr. Coogan concluded, based on the take-off performance data for the Bonanza, the aircraft would have been 180 feet above ground level (580 feet MSL) at the time the Cessna was released to change to the Queen City CTAF frequency. The Bonanza would not have been visible on the ABE Airport radar in its turning configuration until reaching 700 feet above ground level (1,100 feet MSL). (FOF # 36) At the time of the release, therefore, Mr. Coogan concluded that the Bonanza was flying some 520 feet below the level at which ABE Airport radar could have detected it in its turning configuration. (T. 2/15/94, p. 169) Thus, the Bonanza never appeared on Mr. Brickler's radar scope prior to the release of the Cessna to the CTAF frequency.

Despite plaintiffs' arguments to the contrary, we think Mr. Coogan was correct in discounting the significance of the testimony of Mr. Daniel Hellier, a witness to the accident.[7] On the day of the accident he was piloting a Piper Arrow on a sightseeing flight and was monitoring the CTAF frequency. Only minutes prior to the collision Mr. Hellier claimed to have heard transmissions from both the Cessna and Bonanza.

Like Mr. Coogan, we also have some problems with Mr. Hellier's testimony, although we feel he was well intentioned. Mr. Hellier never noted the actual distance from Queen City Airport which was reported over the radio by the aircraft that he believed to be the Bonanza. (T. 2/8/94, p. 68). Nor did he know whether the aircraft had reported being "south" or "southwest" of Queen City. (T. 2/8/94, p. 91). Although Mr. Hellier testified at trial that the radio transmission had been made by a Bonanza, he conceded on cross examination that, during his deposition, he had not been sure whether the transmission had come from a Bonanza. (T. 2/8/94, p. 88). Although he testified during trial that he heard the radio report of the Bonanza before the Cessna's "jumpers away" transmission, he specifically denied, in prior sworn testimony, knowing the order in which he heard the Bonanza and the Cessna transmissions. (T. 2/8/94, p. 96–97).

Mr. Coogan concluded that Mr. Hellier's testimony amounted to "totally useless information from a reconstruction standpoint." (T. 2/14/94, p. 211). Since we find Mr. Coogan's reconstruction to be both thorough and convincing, we agree that Mr. Hellier's testimony was properly discounted by Mr. Coogan in his flight path investigation and evaluation.[8]

Thus, since we adopt Mr. Coogan's version of the events of July 30, 1989, we find that the Bonanza would not have appeared on Mr. Brickler's radar scope.[9] Consequently, plain-

---

7. Plaintiffs assign great significance to the testimony of Mr. Hellier. According to plaintiffs, Mr. Hellier testified that he heard the Bonanza call on the CTAF frequency about three and one-half to four minutes before the crash and announce its presence several miles south or southwest of Queen City Airport inbound to land. This testimony, according to plaintiffs, supports the conclusion that the Bonanza was inbound to Queen City Airport landing pattern two to three minutes before the crash at an altitude detectable by ABE radar. Given the radar capabilities at ABE, plaintiffs argue, the Bonanza was visible on Mr. Brickler's radar scope. (Brief in Support of Findings of Fact of All Plaintiffs, at 8).

8. Plaintiffs also suggest that Mr. Coogan improperly disregarded the testimony of Mr. Daniel that approximately five minutes transpired from the Bonanza's take-off until he saw the falling debris from the collision. Plaintiffs assert that this testimony undermines Mr. Coogan's estimate that the Bonanza was in the air for only 93 seconds prior to impact. Rebuttal Brief of Plaintiffs, at

1–7. While Mr. Coogan did testify that he rejected Mr. Daniel's estimate of the plane being in the air for five minutes (T. 2/14/94 at 219), he also stated that he found the remainder of Mr. Daniel's testimony to be highly reliable and very useful. In·addition, he testified that without a timing device, Mr. Daniel's ability to estimate the Bonanza's flight time was severely limited. (T. 2/14/94 at 219). Consequently, Mr. Coogan was not surprised that Mr. Daniel's Bonanza flight time estimate might have been inaccurate. We find Mr. Coogan's decision to disregard Mr. Daniel's time estimate to be, therefore, wholly reasonable, and we have no doubt that a short period of time was involved.

9. Plaintiffs make much of the fact that Mr. Brickler testified to the presence of an aircraft at East Texas when he released the jump plane. Mr. Brickler determined that this traffic was not relevant to the Cessna's descent. Plaintiffs apparently argue that this radar sighting was, in fact, the Bonanza. Brief in Support of Plaintiffs' Findings of Fact, at 13–14. As we adopt Mr. Coo-

tiffs have not met their burden of proving negligence and we also find that Mr. Brickler was justified in not reporting traffic to the Cessna because he had no way of knowing of the traffic threat posed by the Bonanza. *Compare Allegheny Airlines, Inc. v. United States,* 420 F.Supp. 1339, 1349 (S.D.Ind. 1976), *aff'd in part, rev'd on other grounds* 586 F.2d 53 (7th Cir.1978) (finding liability for a missed traffic call where there is *"no justification* for such a target not to have been seen by the controller") (emphasis added).

## B. Radar Services to the Cessna Were Properly Terminated

Mr. Brickler released the Cessna to switch to the Queen City CTAF frequency at approximately 33:16. (FOF # 28) Mr. Brickler terminated radar services to the Cessna for several reasons: Mr. Brickler scanned his scope and saw no air traffic that posed a risk to the Cessna, the Cessna was in close proximity to the Queen City airport, and he believed that the frequency change was necessary to give Mr. Miller enough time to exchange air traffic information on the CTAF frequency. (FOF # 28)

Plaintiffs allege that Mr. Brickler's decision to release the Cessna to the CTAF frequency was premature. Given the fact that the Cessna was involved in parachute activities, plaintiffs seem to suggest that Mr. Brickler was obligated to maintain contact with the jump plane. Specifically, plaintiffs assert that Mr. Brickler should have provided ATC services to 2,200 feet MSL and below. Plaintiffs' Proposed Findings of Fact, ¶ 46. We must disagree.

The duties of an air traffic controller are set forth in the Air Traffic Control Manual, FAA Order 7110.65 ("ATCM"). *Rodriquez v. United States,* 823 F.2d 735, 740 (3d Cir. 1987). Paragraph 7–101 provides that Visual

Flight Rule aircraft operating within an ARSA shall be provided "mandatory traffic advisories and safety alerts." (Exhibit D–7, ¶ 7–101(a)(4)). Paragraph 7–107 provides, however, that a controller shall "terminate ARSA service to aircraft landing at other than the primary airport at a sufficient distance from the airport to allow the pilot to change to the appropriate frequency for traffic and airport information." (Exhibit D–7, ¶ 7–107).

We have no doubt that the provision of radar services was critical to the safety of the Cessna. Equally critical to the safety of the Cessna's flight, however, was the opportunity to change to the Queen City CTAF frequency. The CTAF frequency provides pilots with the opportunity to listen to traffic information essential to the safety of their flight; it also enables pilots to inform other pilots using the CTAF frequency of their own arrival and departure information. (FOF # 37)

Mr. Robert Hale, plaintiffs' expert air traffic controller, conceded at trial that an air traffic controller has the discretion to release an aircraft to the CTAF frequency one-and-one-half minutes prior to that aircraft entering the traffic pattern *where that controller has determined that there is no conflicting traffic.* (FOF # 49) We already determined that the Bonanza did not appear on Mr. Brickler's scope. Both of plaintiffs' air traffic control experts agreed that, had Brickler not seen conflicting aircraft in the ARSA or the vicinity of Queen City Airport at the time of the actual release to the CTAF frequency, his decision to terminate radar services would not have been negligent. (FOF # 53) We believe that since the Bonanza did not appear on the scope, Mr. Brickler was not negligent in releasing the Bonanza.

In concluding that Mr. Brickler was not negligent, we are mindful of the requirement of added vigilance mandated by Rule 7220.2,

gan's version of events, we reject plaintiffs' assertion that this traffic was the Bonanza. The Bonanza's low altitude at the time of the Cessna's release prevented the plane from appearing on Mr. Brickler's scope. Accordingly, we reject plaintiffs theory with respect to the traffic over East Texas.

In addition, plaintiffs seek to persuade the court to infer negligence from the fact that Mr.

Brickler told the National Transportation Safety Board, on the day after the accident, that he might have overlooked the Bonanza "due to volume and amount of traffic." (Yurman Dep., p. 155). Given our conclusion that it was a physical impossibility that the Bonanza would have appeared on Mr. Brickler's radar, this conjecture is clearly immaterial.

the Position Standards for air traffic controllers. Chapter 30 of the Rule is dedicated to "special operations," a general category which includes parachute jumping. Paragraph 30–44(c)(2) directs the Radar Controller as follows:

> Issue advisory information to jump aircraft and non-participating aircraft as necessary to promote the safety of the operation.

Exhibit P–12. Not only does this rule indicate the need for vigilance, but courts have held an air traffic controller's standard of care increases according to the dangers to be reasonably apprehended in given situations. *Himmler v. United States,* 474 F.Supp. at 929. While we do not doubt that the parachute activities at Queen City Airport created additional safety concerns to pilots operating around the airport, we also are convinced that Mr. Brickler appreciated these concerns and acted with reasonable care. His decision to terminate radar services and release the jump plane was understandable given the need to facilitate Queen City CTAF communications. In addition, nothing in the ATCM or in the 7220.2 order requires an air traffic controller to remain in contact with the pilot of a jump plane until all the jumpers are on the ground. (FOF # 54)

For all of these reasons, we find that plaintiffs have not proven that Mr. Brickler was negligent and we also find that Mr. Brickler violated no duty of care when he released the Cessna to the Queen City CTAF frequency at 33:16.

## III. CONCLUSION

We do not believe that plaintiffs have met their burden of proving that the FAA is accountable for the tragic collision over the skies of the Queen City Airport on July 30, 1989. As FAR § 91.3, 14 C.F.R. § 91.3 (1992) provides, and as courts have long recognized, a pilot is in command of an aircraft and is directly responsible for, and is the final authority as to, the operation of the aircraft. *Redhead v. United States,* 686 F.2d at 182. Ultimately, responsibility for the collision must lie with one or both of the pilots of the Cessna and the Bonanza. We are constrained, however, to determine only the more limited question of the FAA's alleged negligence in this case. Accordingly, we leave the question of possible negligence on the part of the pilots of the two airplanes for its resolution in the appropriate state tribunal.

Thus, for the reasons stated, we find that plaintiffs have failed to prove by a preponderance of the evidence that the FAA was negligent in its provision of air traffic control services in connection with the mid-air collision over Queen City Airport on July 30, 1989. Accordingly, we find and enter a verdict for the defendant United States of America, Federal Aviation Administration.

An appropriate order follows.

### *ORDER*

AND NOW, this 16th day of May, 1994, consistent with the foregoing decision, the court **FINDS FOR** and **ENTERS JUDGMENT IN FAVOR OF** of the Defendant, United States of America, Federal Aviation Administration and **AGAINST** Plaintiffs, William A. Remo, Jr., Anjam Hanid Bhatti, and BettyJune Miller with the exception of those parties that have already settled their claims.[1] This case is **CLOSED.**

---

1. Plaintiffs include William A. Remo, Anjam Hanid Bhatti, and BettyJune Miller. The claims of plaintiff Carlene Malik were settled with the defendant United States of America prior to the trial in this matter. Since we are hearing this case non-jury, the settlement was referred to Chief Judge Cahn of this court for approval. This settlement agreement was approved by Chief Judge Cahn on March 8, 1994.

In addition, plaintiff William Remo entered into a partial settlement agreement with the defendant United States of America with respect to claims arising from the death of Alicia Remo and Kathleen Remo. To the court's knowledge, nothing has yet been filed with the court with respect to this partial settlement.