Jeffrey W. **BENNETT**, Petitioner,

v.

**NATIONAL TRANSPORTATION SAFETY BOARD and Federal Aviation Administration**, Respondents.

No. 94–9543.

United States Court of Appeals, Tenth Circuit.

Sept. 26, 1995.

---

J. Scott Hamilton, Louisville, CO, for petitioner.

James W. Tegtmeier, Attorney, Enforcement Division (Kathleen A. Yodice, Acting Manager, Appellate Branch, with him on the brief), Office of the Chief Counsel, Federal Aviation Administration, Washington, DC, for respondent Federal Aviation Administration.

Before SEYMOUR, Chief Judge and ANDERSON, Circuit Judge and SHADUR, Senior District Judge *.

SHADUR, Senior District Judge.

Jeffrey Bennett ("Bennett") appeals the suspension of his airline transport pilot certificate by the Federal Aviation Administration ("FAA").[1] We exercise jurisdiction pur-

---

* The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

1. While the National Transportation Safety Board ("Board" or "NTSB") performed a quasi-judicial function in this case and is also listed as a respondent, the FAA Administrator ("Administrator") ordered the suspension and is hence the real party in interest.

suant to 49 U.S.C.App. §§ 1486(a) and 1903(d)[2] and affirm.

## Facts

For the most part we have drawn what follows from testimony credited by Administrative Law Judge ("ALJ") Patrick Geraghty in his September 10, 1992 Decision and Order following an evidentiary hearing ("Hearing"). On the few occasions where the full Board modified those findings, Board's version is adopted instead.

Bennett, a corporate pilot for Ames Construction, Inc. with 3,000 hours of flight time, holds an airline transport pilot certificate with type ratings in Boeing 737 and Cessna Citation 500 jets. On the evening of January 18, 1991 Bennett was the pilot in command of a Cessna Citation ("Citation") departing from Centennial Airport in Denver, Colorado under clear visibility conditions. Bennett's first officer Karim Berrada ("Berrada") was responsible for radio communications and navigation, though Bennett also wore a headset.

At about 6:30 p.m. the tower cleared the Citation to taxi to its runway, and a few minutes later air traffic controller ("Controller") John Barnewall ("Barnewall") issued Bennett clearance to take off and fly due south on the runway heading pending further instructions. While Berrada acknowledged that clearance over the radio, Bennett also heard the clearance and took off as authorized.

At the same time that Bennett was issued clearance for takeoff, a Cessna 172 (with Susan O'Malley ["Susan"] as pilot and her husband Theodore ["Theodore"] as passenger) had just completed a touch-and-go landing exercise on a parallel runway and was also climbing southbound. As the Citation climbed from its own runway, Controller Barnewall asked the Citation if it observed the smaller Cessna 172 ahead and to the right. Berrada acknowledged visual contact with the other airplane and pointed it out to Bennett.

Barnewall then instructed the Citation to wait until the Cessna 172 made a right turn before executing its own turn to head toward Denver:

> Thank you after he turns crosswind south of him you can start a right turn and proceed direct to Denver VOR contact Denver departure have a nice flight.

Berrada acknowledged that direction immediately with the Citation's call sign, but Bennett did not hear the exchange due to radio trouble.[3] Berrada then simply told Bennett that the Citation had been cleared to execute the right turn. Bennett executed the turn without waiting for the Cessna 172 to change course, and the consequences of that turn are at issue here.[4]

While everyone involved in the Hearing agreed that there was close visual contact between the Citation and the Cessna 172, they differed as to the physical proximity of the two aircraft. Barnewall testified that he could not estimate the horizontal separation of the two craft, but that in purely vertical terms the Citation flew approximately 150–200 feet above the Cessna 172 as the Citation made its turn. In written statements to the FAA Susan and Theodore (neither of whom testified at the Hearing) estimated 100–150 feet of vertical separation and no horizontal separation, noting that Theodore had felt compelled to take over control of the Cessna 172 from his wife and to initiate evasive maneuvers. Over a ten-second span at the

2. All further citations to Transportation Code provisions will take the form "Section—," avoiding the repetition of "49 U.S.C.App." Although Congress repealed both Sections 1486 and 1903 by Act of July 5, 1994, Pub.L. No. 103–272, § 7(b), 1994 U.S.C.C.A.N. (108 Stat.) 745, 1379, redistributing their provisions so that both sections are now embodied in 49 U.S.C. § 1153(a), those sections and the other statutory provisions cited hereafter continue to apply here because this action was begun before the repeal (see the cited § 7(b)).

3. There is no dispute on that score. After the Citation landed that evening, a check of its radio verified a defect in Bennett's headset that had prevented him from hearing both those communications.

4. Though Bennett claims to have executed the right turn partly out of fear of colliding with an oncoming third aircraft, Board's Opinion and Order ("Op.") 6–7 n. 6 (R. 204–05) says that the ALJ seemingly discredited that testimony.

time of the incident, Theodore had made these comments by radio:

> That was pretty close fella this is six two tango.
>
> Six two tango I'm seeing that myself I'm gonna make a little note of that.
>
> Yeah I'm gonna file a mid air on that one—near miss.

And several minutes later this further transmittal emanated from the Cessna 172:

> [W]e're going to file a ah near miss on that one he came over us about (unintelligible) feet.

Finally, Bennett conceded that he flew about 300 feet above the Cessna 172, though he contended that he never lost sight of the Cessna 172 during the turn and that there was never a collision hazard.

### Procedural History

Shortly after the incident Theodore (a Boeing 737 captain) and Susan filed a near midair collision preliminary report with FAA. On November 20, 1991 the Administrator suspended Bennett's Airline Transport Pilot Certificate for violations of Federal Aviation Regulations, finding that on January 18, 1991:

> 1. In violation of 14 C.F.R. § 91.111(a)[5] Bennett had passed so close to the Cessna 172 that he had created a collision hazard.
>
> 2. In violation of Reg. § 91.123(b)[6] Bennett had operated an aircraft contrary to an ATC (air traffic control) instruction in an area in which air traffic control is exercised.

Bennett's suspension was to last 45 days.

On November 22, 1991 Bennett appealed FAA's order of suspension, and Board ultimately scheduled an ALJ hearing for September 10, 1992. After the Hearing[7] ALJ Geraghty found that Bennett had not heard the tower instructions as to the right turn and that Bennett's reliance on the instruction of his first officer in executing the turn was reasonable. Nevertheless the ALJ determined (1) that Bennett had not complied with the tower's instruction as to the execution of the Citation's right turn and (2) that Bennett had created a collision hazard when he brought the Citation within 200 feet of the Cessna 172. As for the latter finding, Berrada's instruction to execute the turn was cited by way of mitigation only—Bennett's duty to "see and avoid" the other traffic remained. While thus affirming FAA's order of suspension, the ALJ shortened the suspension to 30 days.

Bennett next appealed to the full Board, claiming that the O'Malleys' statements should not have been considered in their absence from the Hearing and that his reliance on Berrada's instruction to execute the right turn should be exculpatory. On April 15, 1994 Board held (1) that Bennett's confrontational rights were not violated by admission of the O'Malleys' written statements and (2) that Bennett could not escape responsibility for the incident by claiming that Berrada told him to execute the turn. Bennett now challenges Board's final order affirming the suspension of his certificate.

Bennett makes three arguments on this appeal. First, he argues for the first time that Board erred in applying a 500-foot separation requirement between aircraft. Second, he objects to Board's asserted reliance on the O'Malleys' "unsworn" written statements[8] when the O'Malleys were not present for cross-examination at the Hearing. Finally, he contends that Board should have found

---

5. All Federal Aviation Regulations will be cited simply "Reg. § —," referring to their numbering in the Code of Federal Regulations but omitting "14 C.F.R." Reg. § 91.111(a) provides:

 No person may operate an aircraft so close to another aircraft as to create a collision hazard.

6. Reg. § 91.123(b) provides:

 Except in an emergency, no person may operate an aircraft contrary to an ATC instruction in an area in which air traffic control is exercised.

7. Instead of citing the Hearing transcript in terms of its internal pagination, we will refer to it when necessary as "R.—," employing the pagination of the record before us (as we do with all other record references).

8. Bennett's repeated reference to those statements as "unsworn" is puzzling—each is expressly stated to have been given "under penalty of perjury."

his reliance on Berrada's instruction exculpatory.

### 500–Foot Separation "Requirement"

Bennett claims for the first time on appeal that Board erred in purportedly applying a requirement of a 500–foot separation between aircraft. Essentially (though he does not frame the issues in just this way) Bennett urges alternatively:

1. Reg. § 91.111(a) does not establish a "sufficiently specific objective standard prescribing or proscribing a pilot's behavior" (Bennett Br. 10) so that a pilot may properly be held accountable for its violation.

2. Board injected an overly specific and objective component into an otherwise subjective regulatory standard when it adopted a 500–foot standard separation requirement.

We reject each argument as both tardy and unpersuasive.

■■■ As an initial matter, we have concluded after reviewing the record that the United States is correct in stating (its Br. 12 n. 4) that Bennett had failed to argue the claimed misapplication of Reg. § 91.111(a) to the full Board, even though he had raised that issue at the Hearing (R. 76–79). Section 1486(e) says that no objection to a Board order "shall be considered by the court [of appeals]" in the first instance "unless there were reasonable grounds for failure" to urge the objection before Board—a provision that we have not labeled as a jurisdictional bar (see, e.g., *French v. C.A.B.*, 378 F.2d 468, 471 (10th Cir.1967), although we note that the Ninth Circuit has more recently done so (see, e.g., *Howard v. F.A.A.*, 17 F.3d 1213, 1216 (9th Cir.1994)). Whatever the appropriate label, well-established principles of appellate review entitle us to reject those newly-tendered contentions without addressing their merits. But because Reg. § 91.111(a) articulates a provision of broad applicability, we spend a few moments on the shortcomings of Bennett's arguments.

■■■ In what amounts to a deprivation-of-due-process claim, Bennett complains that Reg. § 91.111(a) fails to put pilots on notice of the conduct that it proscribes when it refers only to operation of an aircraft "so close to another aircraft as to create a collision hazard." We have impliedly disavowed that notion when we held in *Hill v. N.T.S.B.*, 886 F.2d 1275, 1280 (10th Cir.1989) (emphasis in original) that FAA has authority to suspend a pilot's certificate under a similarly nonspecific statutory prohibition (Section 1429(a) coupled with Section 1301(4)) whenever the pilot creates a hazard to safety:

> The *potential* for pilot conduct to endanger safety in interstate, overseas, or foreign air commerce is all that is necessary to support the FAA's order of suspension.

We now make that rejection explicit.

■■■ *Doe v. C.A.B.*, 356 F.2d 699, 701 (10th Cir.1966) teaches that those sought to be covered by FAA Regulations must be "informed with reasonable certainty and explicitness" of the standards by which their conduct will be judged (accord, *Sorenson v. N.T.S.B.*, 684 F.2d 683, 686 (10th Cir.1982); *Roach v. N.T.S.B.*, 804 F.2d 1147, 1155 (10th Cir.1986)). For that purpose the test is whether the Regulation "delineated its reach in words of common understanding" (*Vandehoef v. N.T.S.B.*, 850 F.2d 629, 630 (10th Cir.1988)). In that respect " 'no more than a reasonable degree of certainty can be demanded' and it is not 'unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line' " (*Throckmorton v. N.T.S.B.*, 963 F.2d 441, 445 (D.C.Cir.1992), quoting *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340, 72 S.Ct. 329, 331, 96 L.Ed. 367 (1952)). In those terms we consider that Reg. § 91.111(a) plainly puts pilots on notice of the kind of conduct covered (cf. *Vandehoef*, 850 F.2d at 630–31; *Roach*, 804 F.2d at 1155–57; *Sorenson*, 684 F.2d at 686; *Doe*, 356 F.2d at 701–02).

■■■ Bennett's alternative claim that Board improperly read a 500–foot separation requirement into Reg. § 91.111(a) mischaracterizes the record. Board's only reference to a 500–foot spacing (Op. 6–7 n. 6, R. 204–05) appears in a footnote dedicated to an analysis of Bennett's claim of reasonable reliance on Berrada's instruction for purposes of Reg.

§ 91.123(b), not Reg. § 91.111(a). But even apart from that, Board's statement that "(Standard airspace separation is 500 feet. *See* Tr. at 47)" was no more than a parenthetical insertion following this statement:

> Recall that respondent was aware of the Cessna 172 to the right in front of him. The duty of care to which he is held requires that he question an instruction to make a right-hand turn that puts him unusually close to another aircraft.

That can scarcely be read as the adoption of a 500–foot rule of law, as contrasted with Board's determination later in the same footnote that the actual distances between the aircraft made it unreasonable for Bennett to rely on Berrada's instruction that he make the turn.[9]

Thus Bennett's basic challenge to Reg. § 91.111(a) as an assertedly nonviable standard for pilot discipline fails on the merits, quite apart from the fact that his challenge is foreclosed by Section 1486(e). What remains for consideration as to that Regulation is Bennett's dispute as to the evidentiary predicate for Board's imposition of discipline on him.

### Confrontation and Hearsay Issues

In our just-completed confirmation of Reg. § 91.111(a) as a valid proscription of Bennett's conduct in having brought the Citation "so close to another aircraft [the O'Malley's Cessna 172] as to create a collision hazard," we have implicitly credited Board's decision to consider the O'Malleys' statements on that score. But it is time to examine that issue directly, for Bennett also contends before us that Board erred in considering the O'Malleys' statements because the couple had not been subject to cross-examination at the Hearing. Bennett argues (1) that he was entitled to cross-examine the O'Malleys at the Hearing and relatedly (2) that his inability to confront the O'Malleys rendered the couple's statements inadmissible hearsay as well. Neither of those positions can carry the day for Bennett.

 Board held that Bennett was not denied the right to confront the O'Malleys because he knew who they were, he had the opportunity to subpoena or depose them before the Hearing and he had access to their FAA reports as official documents (Op. 5–6, R. 203–04). Although Board did not specifically refer to the Constitution in the course of resolving the issue, it implicitly rejected Bennett's attempted reliance (R. 176–78) on the Sixth Amendment. We derive the authority to consider Bennett's constitutional arguments from 5 U.S.C. § 706(2)(B), and we review Board's interpretation of constitutional or statutory provisions de novo (*Hill,* 886 F.2d at 1278).

 Of course Bennett's invocation of the Sixth Amendment is misplaced, for the Confrontation Clause speaks only of "all criminal prosecutions." That constitutional right does not apply to civil administrative matters generally (*Hannah v. Larche,* 363 U.S. 420, 440 n. 16, 80 S.Ct. 1502, 1513 n. 16, 4 L.Ed.2d 1307 (1960)), and we have held in the aviation context that Congress never intended the revocation or suspension of an airman's certificate to be a criminal penalty (*Roach,* 804 F.2d at 1153; see also *Administrator v. Peretti,* N.T.S.B. Order No. EA–3647, 1992 WL 212461, at \*2 & n. 9 (Aug. 11)). Bennett's citations of criminal cases in this area are therefore inapposite (*Woolsey v. N.T.S.B.,* 993 F.2d 516, 521 (5th Cir.1993)).

 Bennett does better—at least conceptually—in terms of the Due Process Clause. *Greene v. McElroy,* 360 U.S. 474, 496–97, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959) (footnote and citations omitted) teaches that when the Fifth Amendment applies, the Government may not penalize an individual without first providing an opportunity for rebuttal, including cross-examination:

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact

---

**9.** Indeed, on at least one other occasion Board has explicitly rejected the notion that the 500 foot separation required between airplanes on various magnetic compass headings should be imported into collision hazard analysis (*Administrator v. Willbanks,* 3 N.T.S.B. 3632, 3634, 1981 WL 40252 (1981)).

findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment which provides that in all criminal cases the accused shall enjoy the right "to be confronted with the witnesses against him." This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases, but also in all types of cases where administrative and regulatory actions were under scrutiny.

See also *Goldberg v. Kelly,* 397 U.S. 254, 269–70, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970); 5 U.S.C. § 556(d).

■ But while Fifth Amendment protection extends to agency adjudications of the sort at issue here, that does not help Bennett. Under the circumstances he is no more entitled to complain of a lack of cross-examination of the O'Malleys than was the claimant in *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), where the Court said in rejecting a like argument (*id.* at 407, 91 S.Ct. at 1430):

Notice was given to claimant Perales. The physician's reports were on file and available for inspection by the claimant and his counsel. And the authors of those reports were known and were subject to subpoena and to the very cross-examination that the claimant asserts he has not enjoyed.

That brief description strikes a close parallel to the situation here. Bennett had been notified during the week preceding the Hearing that the O'Malleys would not be able to attend due to their vacation plans (R. 72–73) and that FAA would seek to have the O'Malleys' "testimony, at least in the form of a declaration" available at the hearing (R.

72)—hardly the sort of anonymous confidential reports at issue in *Greene,* 360 U.S. at 498–99 & nn. 26–27, 79 S.Ct. at 1414–15 & nn. 26–27. Nevertheless, Bennett failed to subpoena the O'Malleys, as was his right under Board's Rules of Practice (49 C.F.R. §§ 821.20(a), 821.35(b)(4)). Nor did he seek to depose the O'Malleys (49 C.F.R. §§ 821.19(a), 821.35(b)(4)) or request a continuance either before the Hearing or afterwards. Thus having forgone the available opportunities for cross-examination, he cannot ascribe error on that ground.

■ As for Bennett's related claim that the O'Malleys' statements were inadmissible hearsay, once again it appears that Bennett pursues that line of argument for the first time on appeal to this Court—enough of itself to permit its rejection out of hand. But even brief analysis shows that the argument is devoid of merit in any event.

■ To begin with, agencies are not bound by the strict rules of evidence governing jury trials (*Gallagher v. N.T.S.B.,* 953 F.2d 1214, 1218 (10th Cir.1992) and cases cited there). Rather the Administrative Procedure Act (5 U.S.C. § 556(d)) renders admissible any "oral or documentary evidence" except "irrelevant, immaterial, or unduly repetitious evidence" (see also *Sorenson,* 684 F.2d at 686). Thus hearsay evidence is not inadmissible per se (*Woolsey,* 993 F.2d at 520 n. 11). Indeed, *Richardson,* 402 U.S. at 407–08, 409–10, 91 S.Ct. at 1430, 1431 suggests that where a claimant has failed to subpoena a witness, even uncorroborated hearsay evidence elicited from that witness may constitute substantial evidence in an administrative hearing if found reliable and probative. But we need not decide that question now (see *Roach,* 804 F.2d at 1160 n. 12), given the existence of ample corroborative evidence—both nonhearsay and hearsay exceptions.

■ It must be remembered that the key issue before the Board was whether Bennett had brought his aircraft so close to the O'Malleys' Cessna 172 as to create a collision hazard. On that subject Board was certainly entitled to view the O'Malleys' statements as reliable and probative within the boundaries set by *Richardson*—particularly as they

meshed with the testimony of Controller Barnewall and the earlier recorded statements of the O'Malleys themselves (while airborne). As already stated, during the very course of the incident Theodore said "That was pretty close fella" and referred to what had just happened as "a near miss" (R. 140), repeating the latter characterization a few minutes later (id.). That first statement was admissible as a hearsay exception under both Fed.R.Evid. 803(1) and 803(2), while the second statement fit within the first of those rules.[10]

■ In sum, Bennett's objection to the substantiality of the evidence supporting Board's position is unsuccessful both in technical evidentiary terms and substantively. Board considered and evaluated the eyewitness accounts of Bennett's conduct in permissible fashion, and its decision is entitled to deference (see Sorenson, 684 F.2d at 685).[11]

### Claimed Violation of Reg. § 91.123(b)

As we have said earlier, Board upheld the ALJ's determination that Bennett violated Reg. § 91.123(b) as well—it agreed that he had "operate[d] an aircraft contrary to an ATC instruction." Bennett frames his quarrel with that determination in terms of Board's having erred when it refused to find that his reliance on Berrada was wholly exculpatory rather than serving as a mitigating factor: Because Bennett's defective radio equipment prevented him from hearing the tower transmission about the right turn, Bennett argues that his reliance on Berrada's inaccurate relay of that instruction should absolve Bennett of any breach of Reg. § 91.123(b).

■ In the situation under review that comes down to a matter of semantics. In view of our already-stated affirmance of

Board's determination that Bennett did create a collision hazard in violation of its other Regulation, coupled with Board's imposition of a more modest sanction in light of Bennett's not having heard the ATC instruction, even if Board were held to have misapplied Reg. § 91.123(b) (a determination that we do not make) any claimed error in that respect would have to be viewed as harmless.

To recapitulate a bit, the FAA Administrator originally suspended Bennett's certificate in part because Bennett had disobeyed an ATC instruction (R. 1):

3. Just prior to takeoff, you were given an Air Traffic Control clearance to take off with instructions to maintain runway heading until south of previously called traffic before turning right.

\* \* \*

5. After takeoff, you turned right before you were south of the Cessna 172 and flew over the Cessna 172.

If that had been an accurate account of events, the finding of Bennett's violation of Reg. § 91.123(b) would have been equally accurate. But the statement of "facts" was simply false, for nothing in the pre-takeoff communication had said a word about when and how to turn (as stated earlier, Bennett had simply been told to maintain the runway heading until instructed differently). There is no question that the instruction clearing the Citation for a right turn was a separate later transmission after the aircraft was airborne (R. 139–40)—a matter confirmed by Board itself when it said just that (R. 200)—and both the ALJ and the full Board credited Bennett's testimony that he did not hear the later instruction (R. 129, 201–04).

Though both tribunals thus corrected the FAA's misinterpretation of the facts, they

---

10. Although Bennett's own admission that he had passed an estimated 300 feet above the Cessna 172 (R. 144) is not fatal to his position because it contained no reference to horizontal separation (and hence he did not himself acknowledge an unreasonably small total separation), it was competent for Board to link that admission to the other evidence in reaching its conclusion that a collision hazard had in fact been created.

11. Though the government has surprisingly failed to make the point, recent Board precedent holds that the mere fact that experienced Boeing 737 pilot Theodore took evasive maneuvers to avoid the Citation is evidence of a potential collision hazard and hence tends to establish Bennett's violation of Reg. § 91.111(a) (Administrator v. Reinhold, N.T.S.B. Order No. EA–4185, 1994 WL 267724, at *3 (May 25); Administrator v. Tamargo, N.T.S.B. Order No. EA–4087, 1994 WL 66066, at *2 (Feb. 10)).

found that Bennett had acted "contrary to an ATC instruction" in violation of § 91.123(b) (R. 130, 204–05). Because it ultimately makes no difference in the outcome, we need not decide whether such a conclusion (effectively finding Bennett to have violated an instruction that he admittedly never received) is in any tension with prior Board precedent.

 Earlier Board cases addressing Reg. § 91.123(b) have indicated that it does not establish a strict liability standard. Thus *Administrator v. Coleman*, 1 N.T.S.B. 229, 231, 1968 WL 7201 (1968) overturned a Board examiner's finding of the violation of an analogous regulation (then Reg. § 91.75(a), since renumbered Reg. § 91.123), holding that the reliance of a pilot in command on his co-pilot's mistaken "clarification" of a transmission that the pilot in command had not heard himself "can not be made the basis for a violation of the pertinent safety regulations." Some years later *Administrator v. Thomas*, 3 N.T.S.B. 349, 351–52, 1977 WL 22277 (1977) decided that a pilot in command cannot be held accountable for violation of an ATC instruction that he does not hear or understand due to circumstances found to be beyond his control.

 But nothing in those cases suggests that Board may not conclude that such a pilot has violated others of its Regulations if the pilot's reliance on what a fellow crew member has told him about an ATC instruction is unreasonable. That was the case, for example, in *Administrator v. Valentine*, Order No. EA–4263, 1994 WL 614025, at *1–*2 (Oct. 6), and it was the case here. In deciding that Bennett had created a collision hazard by acting in accordance with Berrada's version of the ATC instruction that Bennett himself had not heard, Board basically found that both Bennett's senses and his experience should have told him that he could not rely on that version. That finding was entirely permissible, and as already indicated it is all of a piece with Board's determination that Bennett violated Reg. § 91.111(a).

Under those circumstances we are not called upon to decide whether Board's decision that Bennett also violated Reg. § 91.123(b) squares with the earlier holdings in *Coleman* and *Thomas*. Nor are we called upon to consider whether Board's role in the administration of the statute and regulations might justify its departure from those decisions if it considered that course of action appropriate. Even a negative answer to both of those questions would leave unimpaired Bennett's violation of Reg. § 91.111(a). ALJ Geraghty, viewing Bennett's failure to hear the ATC instruction as a mitigating circumstance, reduced Bennett's suspension from 45 to 30 days, and the full Board upheld that reduced sanction (R. 130, 205). Hence Bennett must be considered to have received the full benefit that he would have received even if he were right in arguing that the Reg. § 91.123(b) charge should be dismissed as erroneous.

### Conclusion

 FAA has the power to suspend a pilot's certificate where it has been determined that safety in air commerce or transportation and the public interest so require (*Dilley v. N.T.S.B.*, No. 93–9570, 1995 WL 92646, at *3 (10th Cir. Mar. 6, 1995)). Board in turn has broad discretion to decide the appropriate sanction for a violation of FAA regulations (*Pinney v. N.T.S.B.*, 993 F.2d 201, 204 (10th Cir.1993)). Here we conclude that Board's denial of Bennett's appeal as to the Reg. § 91.111(a) violation was supported by substantial evidence. Certainly Board did not act arbitrarily or capriciously, abuse its discretion or fail to act in accordance with law on that score. And as for any claim that Board was in error when it affirmed Bennett's violation of Reg. § 91.123(b), any putative error in that respect (a subject on which we express no conclusion) would have been harmless in light of the penalty properly imposed for the same conduct under Reg. § 91.111(a). Accordingly we AFFIRM and order that our mandate shall issue forthwith.